**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NICOLE HARRIS

    Petitioner,

       v.

SHERYL THOMPSON, Warden, Dwight
Correctional Center,

    Respondent.

No. 10 CV 6257
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

This case involves the tragic death of a four-year-old child, Jacquari Dancy. Petitioner Nicole Harris ("Petitioner" or "Harris") is prisoner number R80396 in the Illinois Department of Corrections. She is presently being held in the custody of respondent Sheryl Thompson, the warden of the Dwight Correctional Center, a maximum security adult female penitentiary. Petitioner is serving a thirty-year sentence for first-degree murder. She was convicted by an Illinois jury for murdering Jacquari, who was her son.

The implement of Jacquari's death was a loose elastic cord from a fitted bed sheet which was wrapped around his neck and had strangled him to death. The State of Illinois claimed Petitioner murdered her son with the bed cord, intentionally wrapping it around his neck because he was insolent and would not stop crying; Petitioner swears that her son's death was a tragic accident in which Jacquari himself, either intentionally while playing or unintentionally, wrapped the cord around his own neck.

Indisputably the most significant piece of evidence in Petitioner's trial was her detailed videotaped confession to the crime, a confession which took place in the Chicago Police

Department's Area 5 Headquarters on the day after Jacquari's death. To counter the obvious effect of this confession, Petitioner took the witness stand and testified in her trial, claiming that her son's death was an accident and that she was coerced into providing the confession.

The jury convicted Petitioner, an Illinois Appellate Court affirmed, and the Illinois Supreme Court declined to hear the case. In this court, Petitioner seeks relief via writ of *habeas corpus,* making four general claims. For the following reasons, the requested relief must be denied. Petitioner is granted a certificate of appealability with respect to her third and fourth claims.

## I. BACKGROUND

The facts as determined by the state court are presumed to be correct in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007). Petitioner has disclaimed any argument under § 2254(e)(1). I therefore largely adopt the background facts and procedural history as laid out by the Illinois Appellate Court, First District, *see United States ex rel. Hemphill v. Hardy*, 2011 U.S. Dist. LEXIS 75519 (N.D. Ill. Jul. 13, 2011).

## A. Facts

In the afternoon of May 14, 2005, his father, Sta-Von Dancy, discovered Jaquari's lifeless body on the floor of his bedroom. *People v. Harris*, 904 N.E.2d 1077, 1079 (Ill. App. Ct. 2009). An elastic cord or band dangling from a fitted sheet on the top bunk was wrapped repeatedly around Jaquari's neck. *Id.* Sta-Von unwrapped the band and began mouth-to-mouth resuscitation. *Id.* When Jaquari failed to respond, Sta-Von picked him up and ran

outside. He encountered Petitioner, who had returned from the laundromat and was parking her car. *Id.* at 1079-80. They rushed off in search of a hospital, with Petitioner driving and Sta-Von continuing his CPR efforts. *Id.* at 1080. An ambulance eventually met them and Jacquari was taken to Resurrection Hospital on the Northwest side of Chicago, where he was pronounced dead. *Id.*

*The Initial Investigation*

In the evening of May 14, Chicago police officers were summoned to Resurrection to begin their investigation into Jaquari's death. *Id.* Detective Randall Wo met with Petitioner and Sta-Von in a family room about 7:15 p.m. and after expressing sympathies had a brief conversation with the parents. *Id.* Wo testified that it was customary in child death investigations to ask parents to assist in the investigation and both Sta-Von and Petitioner agreed to come to the station. *Id.* Although Petitioner was given the option of driving her own car to Area 5 headquarters, she was too emotional and instead elected to ride in a police car. *Id.* The parents arrived at the station between 8 and 9 p.m. *Id.*

Detective Anthony Noradin was among the team of officers assigned to the death investigation. *Id.* Initially, he was basically told that "there was a four-year-old child they found with an elastic band wrapped around his neck." *Id.* There was no indication that this was a murder investigation. *Id.* Detective Noradin and his partner, Detective Kelly, interviewed Petitioner at 9 p.m. in the "quiet room," a sensitive room used mainly for victims of sexual assaults. *Id.* The room is approximately 18 by 12 feet, with a table and chairs, a television, telephone and a computer. *Id.* Petitioner was not restrained; her five-year-old son Diante was seated on her lap. *Id.* The detectives asked questions concerning background information as

3

well as the family's activities during the day. *Id.* Her responses gave the officers no reason to
believe that Jaquari's death was the result of anything but an accident. *Id.* Following this 25- to
30-minute conversation, the detectives left Petitioner and Diante in the room with the door open.
Petitioner was not told she was under arrest nor was she told that she was free to leave. *Id.* The
detectives passed the results of their conversation to other detectives who were about to interview
Sta-Von. *Id.* It is customary interviewing practice to separate witnesses during investigations.
*Id.*

*Petitioner's Arrest and Custodial Interrogation*[1]

As the investigation continued, Detectives Balodimas and Landando left the station to re-
canvas the family's apartment building at 2004 North LaPorte in Chicago. *Id.* After speaking
with other tenants, they returned to the station to confront Petitioner with some of the
inconsistencies between her earlier comments and what they had learned from her neighbors. *Id.*
Detective Balodimas told Petitioner that contrary to her earlier statement, the neighbors said that
she had struck her children that day with a belt, rather than with her hands. *Id.* They spoke for
about fifteen minutes and toward the end of the conversation, Petitioner told the officers that
when she returned from the laundromat, she got mad when she saw Jaquari and Diante outside.
*Id.* She then broke down, started crying, and spontaneously stated, "I wrapped the phone cord
around Jaquari's neck and then I wrapped the elastic band from the bed sheet around his neck to
make it look like an accident." *Id.* Detective Landando immediately stopped the questioning and
read Petitioner her *Miranda* rights from his Fraternal Order of Police book. *Id.* According to

---

[1]What transpired next was the subject of conflicting testimony. The facts are first
presented as they were told by the State.

Noradin, Petitioner acknowledged them, saying: "I understand my rights. I have a degree from Southern University of Illinois. I understand my rights." *Id.* at 1080-81. She was then placed under arrest and moved to Interview Room A, a secure room. *Id.* at 1081 Although the room has a metal bench and handcuff bar, Petitioner was not restrained. *Id.* The questioning did not resume at this time. *Id.*

At 1:40 a.m., Noradin and Kelly returned to the interview room and again spoke with Petitioner. *Id.* Noradin informed her that an assistant State's Attorney would be coming out to memorialize her statement. *Id.* In turn, Petitioner recanted, denying that she caused Jaquari's death. *Id.* The conversation lasted but five minutes. *Id.*

The detectives next spoke to Petitioner at about 2:25 a.m. at which time she agreed to take a polygraph examination. *Id.* Arrangements were made to do the examination later that morning. *Id.* At 11:30 a.m., Noradin took Petitioner to the polygraph section located at 1819 West Pershing Road. *Id.* Sta-Von was taken there in another car having likewise agreed to the examination. *Id.* Investigator Bartik, the polygraph examiner, first spoke to the detectives concerning the facts of the case. *Id.* He met with Petitioner at 12:45 p.m., at which time she signed the polygraph consent, which included her *Miranda* waiver. *Id.* At no time did she elect to remain silent or request an attorney. *Id.* The examination took about an hour and a half and Petitioner answered the questions coherently. *Id.* Although Bartik could not determine whether Petitioner was telling the truth, he informed the detectives that she had made certain statements that were inconsistent with earlier accounts as well as information provided by Sta-Von. *Id.* In turn, the detectives re-interviewed Petitioner at the polygraph section and were then told that

after Petitioner took Jaquari back into the bedroom, she spanked him again, grabbed the elastic band from the top bed sheet, put it around his neck, laid him on the top bunk and then left. *Id.*

Petitioner was returned to Area 5 and again placed in the "quiet room." *Id.* At 7:10 p.m., she again spoke with Balodimas, Landando and Noradin. *Id.* After being reminded of her rights, Petitioner was confronted with the fact that because there was a bed rail around the bunk, there was no way Jaquari could have rolled off the bed and fallen to the floor. *Id.* The Petitioner then stated she wanted to tell the truth; that she wrapped the elastic band around Jaquari's neck three to four times and pulled it until he stopped crying. *Id.* She saw blood coming from his nose, laid him down and then left. *Id.* In turn, Noradin called the State's Attorney's office and asked for a felony review assistant to come to the station. *Id.*

Assistant State's Attorney Lawrence O'Reilly had been summoned earlier to Area 5 on another investigation. *Id.* Because the detectives on that matter did not need him immediately, he agreed to help with this case. *Id.* O'Reilly, together with Detectives Noradin and Cordero, met with Petitioner around 8:30 p.m. in the "quiet room," which O'Reilly described as an office, a yellow room "with butterflies and ladybugs and things" painted on the wall. *Id.* After introducing himself and making it clear that he was an assistant State's Attorney and not Petitioner's lawyer, O'Reilly "*Mirandized*" the Petitioner. *Id.* She acknowledged her understanding and agreed to tell him what had happened to Jaquari. *Id.*

According to Petitioner, on the prior day, she and Sta-Von left for the laundromat late in the afternoon, instructing both children to remain inside. *Id.* They spent thirty to forty minutes there and on returning home found Jaquari outside with older boys, kids who were seven and eight. *Id.* She took Jaquari to his bedroom, pulled down his pants and spanked him with a belt.

6

*Id.* at 1081-82.  She spanked her other son too and left both children in the bedroom.  *Id.* at 1082.  Jaquari would not stop crying so Petitioner told him: "There's nothing wrong with you. Stop crying."  *Id.*  The crying continued.  *Id.*  She reentered the children's bedroom and grabbed the elastic portion of the fitted sheet from the top bunk and wrapped it around Jaquari a number of times.  *Id.*  He had a little bit of blood coming from his nose and eventually he stopped crying and squirming.  *Id.*  She left Jaquari in the bed with the elastic band around him.  *Id.*  Her boyfriend was asleep in their bedroom and Petitioner then went back to the laundromat to finish her laundry.  *Id.*  She returned about thirty minutes later and after double parking in front of the house, brought the laundry to the door and rang the bell.  *Id.*  Her boyfriend responded and took the laundry and Petitioner went back to park the car.  *Id.*  When she returned, the boyfriend was holding Jaquari, who was discolored and not breathing.  *Id.*  They then got into the car and started to the hospital, calling 911 en route.  *Id.*

Toward the end of the interview, and out of the presence of any police officers, O'Reilly asked Petitioner how she had been treated by the police.  *Id.*  In response, Petitioner stated that she had been treated well.  *Id.*  He then explained various ways to memorialize her statement and Petitioner agreed to do a videotaped statement.  *Id.*  O'Reilly then left to make arrangements and secure the consents and paperwork.  *Id.*  As he walked out he was met by Andrea Grogan, the felony review assistant who had actually been called on Jaquari's death investigation.  *Id.*  He turned the case over to Ms. Grogan and returned to the investigation to which he had originally been assigned.  *Id.*

Assistant State's Attorney Grogan interviewed Petitioner at 9:20 p.m. in the "quiet room" with Noradin, Balodimas and Cordero.  *Id.*  After explaining her role as an assistant State's

Attorney, Grogan advised Petitioner of her *Miranda* rights, which Petitioner acknowledged.  *Id.*

They then spoke for about 40 minutes, and toward the end of the interview, the detectives were

asked to leave the room.  *Id.*  In response to Grogan's inquiries, Petitioner then told her that she

had not been forced or threatened to speak, that she had been treated fine by the detectives,

provided food and drink and allowed to use the bathroom.  *Id.*  In a second conversation at about

11:45 p.m., Petitioner chose to give a videotaped statement and appropriate arrangements were

made.  *Id.*  The statement was actually videotaped at 1:06 a.m. on May 16, and lasted about 20

minutes.  *Id.*  The videotape, together with its transcription were admitted during the trial and

were likewise reviewed by the appellate court.  *Id.*

In the pretrial proceedings, Petitioner filed a motion to suppress statements wherein she

alleged *inter alia* that she was never given her *Miranda* warnings, that she was incapable of

understanding them and that she was subjected to physical and mental coercion.  *Id.*  Responding

to those allegations, all of the police personnel and assistant State's Attorneys involved in the

investigation testified that Petitioner was duly admonished of her rights, acknowledged her

understanding and agreed to waive them.  *Id.*  Likewise, all of the officers denied any physical or

mental coercion, specifically, that Petitioner had been shoved, poked or handcuffed to a wall,

berated or called names, made promises or subjected to any threats.  *Id.*  Further, the witnesses

testified that Petitioner was provided food, drink, and water and allowed to use the bathroom.  *Id.*

She made no complaints about her treatment during the course of the investigation.  *Id.*  The

Petitioner offered no evidence on the motion, choosing to reserve her challenges to the

statements for presentation before the jury. In turn, the motion to suppress was denied.  *Id.* at

1082-83.

*The Trial Proceedings*

At trial, the State introduced the evidence previously recounted encompassing the initial investigation, Petitioner's arrest and custodial interrogation. *Id.* at 1083. Assistant State's Attorneys Grogan and O'Reilly also related their involvement in the investigation, and the videotape of Petitioner's confession was introduced and published before the jury. *Id.*

Additionally, the State presented Sta-Von Dancy whose testimony focused on the events of the tragic day, culminating in his discovery of Jaquari's lifeless body. *Id.* Sta-Von testified that as he approached Jaquari, he saw that his face was purple. *Id.* He observed elastic wrapped tightly on his neck, close to 10 times, and succeeded in unwrapping it before taking Jaquari in his arms. *Id.* Sta-Von had seen the elastic before, hanging from the sheet on the top bunk reaching almost to the bottom bed. *Id.* Jaquari had played with the sheet before, wrapping it around his neck. *Id.*

The prosecution also offered testimony from Assistant Cook County Medical Examiner John Scott Denton, who conducted the post-mortem examination of Jaquari. *Id.* Dr. Denton had performed 2,000 to 2,500 autopsies of which 30 were strangulation cases. *Id.* Among Denton's significant findings were petechiae or pinpoint hemorrhages in both eyes, indicative of increased pressure around the neck. *Id.* There were also impression or ligature marks on Jaquari's neck, most prominent on the left side and somewhat fainter on the right. *Id.* Dr. Denton testified that a ligature causes arterial pressure to rise, but prevents the blood from returning back down. *Id.* As a result, the head becomes very congested, causing blood vessels to burst. *Id.* Accompanying the body was a blue fitted sheet with a protruding elastic cord. *Id.* The cord was consistent with and completely covered the ligature mark, an exact fit to its horizontal and vertical ridges. *Id.*

9

Although Denton was also provided a telephone cord, it did not have the horizontal marks consistent with the elastic band. *Id.*

Dr. Denton formed two opinions relative to cause and manner of death. *Id.* The first opinion was formed during the autopsy on May 15:

> My opinion at the time was that this was a tragic accident, that this was a boy who was in his upper bunk bed who had become entangled with an elastic bed fitted sheet and had fallen to the ground from his upper bunk and that this was just a tragic accident that occurred and it was a hanging.

*Id.* Several days later, a detective informed the doctor of Petitioner's confession. *Id.* In turn, Denton was provided with the confession, detective reports and scene photographs of the room and the bunk bed. *Id.* Initially, he had understood that Jaquari had been in the top bunk, but later learned that Jaquari was actually in the bottom bed. *Id.* Scene photographs also depicted what appeared to be a small amount of blood on the sheets of the lower bunk. *Id.* He also learned that the Petitioner had struck Jaquari with a belt the afternoon of his death. *Id.* Based on that information, Dr. Denton issued a new opinion concluding that the cause of death was strangulation due to elastic ligature; it was an intentional injury and, therefore, homicide. *Id.*

The State then rested, and following the denial of Petitioner's motion for a directed verdict, the defense offered evidence comporting with its theory that the cause of Jaquari's death was accidental strangulation. *Id.* Consistent with that defense, Petitioner challenged the foundation and veracity of her confession, asserting that it was falsely contrived and forced upon her by police threats and promises. *Id.* at 1083-84.

At trial, several family members offered testimony supporting the defense theory of accidental death. *Id.* at 1084. Petitioner's cousin, Wanda Harris, described Diante as inquisitive and Jaquari as playful. *Id.* The boys would spend weekends with her playing video games and

10

pretending to be superheroes. *Id.* They were constantly flipping each other and jumping up and down on the couch. *Id.* However, she never saw Jaquari wearing a cape or anything like that when they were playing superheroes. *Id.* Sta-Von testified that the boys acted out things they had seen in Spiderman movies. *Id.* Also, as noted, he had earlier seen the elastic protruding from the top sheet in the boy's bedroom. *Id.* Jaquari had played with the sheet before, wrapping it around his neck. *Id.* Petitioner's sister-in-law, Audrey Harris, also testified that when the boys played at her house, Jaquari "would be into things." *Id.* On one occasion, she had left a laundry bag hanging in her car and when she looked up, Jaquari "had that thing all over his face." *Id.* Additionally, the defense sought to offer the testimony of five-year-old Diante, that while the boys were alone in their bedroom on the afternoon of the occurrence, he was playing his videogame, and Jaquari was "playing with that string and wrapping it around his neck." *Id.* However, following a hearing, the court found that Diante was incompetent to testify in accordance with section 115-14 of the Illinois Code of Criminal Procedure of 1963. 725 Ill. Comp. Stat. 5/115-14. *Id.*

Petitioner testified that she was 23 years old and had graduated from Southern Illinois University with a bachelor's degree in psychology. *Id.* She recently began working as a psychiatric rehabilitation service coordinator at Winston Manor Nursing Home, doing group assessments with mentally ill patients. *Id.* The family, which included Sta-Von, herself, Diante and Jaquari, had just moved into the LaPorte Street apartment. *Id.* The apartment consisted of two bedrooms, a front room and a kitchen. *Id.* The boys shared one of the bedrooms, which contained a bunk bed, dresser and a television set. *Id.*

Petitioner related that in the afternoon of May 14, she washed her clothes in the laundromat across the street. *Id.* While the clothes were drying, she returned home and

discovered Diante in the hallway. *Id.* The back door was open and Jaquari was outside. *Id.* She scolded the children for being out of the house without permission and ordered them to their room. *Id.* Jaquari was crying, but after Sta-Von went into the bedroom to comfort him, the crying stopped. *Id.* When he returned, Sta-Von fell asleep on the couch until Petitioner woke him and helped him to their bedroom, where he again fell asleep. *Id.*

Petitioner then went back to the laundromat and, after gathering the clothes, returned home. *Id.* She rang the doorbell for Sta-Von to take the clothes while she parked the car. *Id.* As Petitioner was parking, Sta-Von came running out with Jaquari in his hands and she asked what had happened. *Id.* Sta-Von said he did not know and to just get to the hospital. *Id.* As Petitioner drove, Sta-Von was giving mouth-to-mouth resuscitation. *Id.* Eventually, an ambulance met them and took Jaquari to the hospital. Before joining him, they returned home to pick up Diante. *Id.*

Upon arriving at the hospital, Petitioner and Sta-Von were told that Jaquari was dead. *Id.* They were then taken to the chapel, where they met with the doctor, a grief counselor and several detectives. *Id.* After about an hour, a detective asked them to come to the station for questioning, saying that it was procedure because this was not a natural death. *Id.* Although the police offered to let Petitioner drive her own car, she declined because she was too emotional to drive, and instead rode with Diante in a police car. *Id.* at 1084-85.

When they arrived at the station, Petitioner and Diante were escorted to a room that had a desk, chairs, a cabinet and computer. *Id.* at 1085. Detectives were in and out asking her questions about when she got up, whether she washed her clothes and other activities of the day. *Id.* Initially, the police treated her "okay" and she continued cooperating with them. *Id.* At some point they left, leaving Petitioner and Diante in the room. *Id.*

12

After several hours passed, a man from the Illinois Department of Children and Family Services named Scott Peterson came and asked if there was anywhere for Diante to go. *Id.* Petitioner told him that Diante could go to his grandmother's home and then signed papers giving temporary guardianship to the grandmother, Patricia Dancy. *Id.* As Diante was leaving, Detective Noradin removed Petitioner from the initial interview room to another room with a steel bench and a bar over it. *Id.* Noradin shoved her into the room and "he was, like, you're under arrest for murdering your f'g son." *Id.* He handcuffed Petitioner to the bar, telling her "I'm sick of your BS lies, you are sitting here playing games with us, you can't sit here and say you didn't do it because we already found the cord." *Id.* Petitioner started crying and said she was telling the truth. *Id.* She asked for an attorney, but was told she did not need one, she needed to cooperate. *Id.* The detectives remained in the room with her for about 20 minutes. *Id.* They then removed the handcuffs and left. *Id.* In turn, another detective arrived and told Petitioner to tell the truth; he said that he had talked to Sta-Von, who thought it was possible that Petitioner had done it. *Id.*

Later, the detectives returned and asked Petitioner if she would be willing to take a lie detector test and she agreed. *Id.* The test was scheduled for the morning and Petitioner remained in the interrogation room, leaving only once to use the bathroom. *Id.* Although she had a blanket with her, Petitioner was unable to sleep. *Id.* Noradin took her to the polygraph place, where Detective Bartik provided a consent form for her to sign and then gave the examination. *Id.* When it was over, Bartik began to ask questions and repeatedly accused her of lying. *Id.* According to Petitioner, Bartik told her, "You know what, Nicole, you are pissing me off. I've been very patient with you and you are still sitting up here, you are lying to us, you know what, you're acting like a monster." *Id.* Petitioner said she wanted an attorney because she was telling

13

the truth. *Id.* Another detective threatened to "turn this stuff over to the state" and Bartik warned

that she would "spend the rest of your life behind bars because you won't cooperate." *Id.*

Bartik continued asking what happened and how many times she wrapped the string

around Jaquari's neck. *Id.* Petitioner continued shaking her head and crying and then she said, "I

was, like one time," at which point Bartik left the room. *Id.* He returned and told Petitioner that

Sta-Von said he found the string wrapped around Jaquari's neck four or five times. *Id.* Bartik

then produced a picture of the children's bunk bed and asked Petitioner how she did it. She said

that she continued shaking her head, "And then I started agreeing." *Id.*

Petitioner testified that Noradin then took her back to the station, where a detective

named "Bobby" arranged for her to talk with an assistant State's Attorney and rehearsed the

police version of events that she should tell the prosecutor. *Id.* The detective urged her to "do

the videotape because it shows lots of emotion and you are very upset, they need to see that

you're upset." *Id.* "Bobby" assured her that because Petitioner was cooperating, she would be

charged with something like voluntary manslaughter, rather than murder. *Id.* at 1085-86.

Detective Noradin also joined in telling Petitioner that "even if you had to go to jail for a minute,

bond won't be that high; your parents could come get you out, and you can fight it from the

outside." *Id.* at 1086.

When Assistant State's Attorney O'Reilly entered the room with Noradin and "Bobby,"

Petitioner provided the rendition of events she had rehearsed. *Id.* At one point the detectives

were asked to leave the room and Petitioner told the prosecutor that she "had been shoved and

stuff," but not by "Bobby," and the attorney took note of it. *Id.* She also told this to the female

assistant State's Attorney who videotaped her statement. *Id.*

14

As she concluded her testimony, Petitioner recalled that the blue sheet on Diante's bed was ripped, but the elastic that was hanging out was still attached.  *Id.*  She denied wrapping anything around Jaquari's neck, telling the jury that she gave the statement:

> Because I was scared, and they told me I would be able to go home; and that I wasn't cooperating, and if I didn't cooperate with them, that they were going to turn the stuff over to the state and the state was going to slam my ... ass.

*Id.*  On rebuttal, Detective Landando acknowledged that the secure room to which Petitioner was taken upon her arrest had a metal bench with a hook on the wall; however, Petitioner was not handcuffed.  *Id.*  Detective Cordero, "Bobby," likewise testified and denied rehearsing Petitioner's videotaped statement or telling her she could go home if she cooperated with the police.  *Id.*  Additionally, Assistant State's Attorney O'Reilly denied that Petitioner ever told him that she had been pushed, poked or in any way mistreated by the police.  *Id.*  Similarly, Assistant State's Attorney Grogan denied that Petitioner told her she had been poked by any detectives.  *Id.*  According to both Grogan and O'Reilley, had that happened, the accusation would have been investigated.  *Id.*

On the fourth day of trial, following closing argument, the jury retired to deliberate.  *Id.*  The defense proved unavailing.  *Id.*  The jurors arrived at a guilty verdict after two hours and twenty minutes of deliberation, presumably including lunch.  *Id.*  Thereafter, motions for new trial were filed by the Petitioner *pro se*, her trial attorneys, and substitute counsel who appeared for post-trial proceedings.  *Id.*  All motions eventually were denied and Petitioner was sentenced to a term of thirty  years' imprisonment.

B. Procedural History

Harris appealed her conviction.  Losing in the intermediate appellate court, Harris sought review from the Supreme Court of Illinois.  Harris's Petition for Leave to Appeal ("PLA") was

denied by that court. *People v. Harris*, 919 N.E.2d 358 (Ill. 2009). She declined to appeal to the Supreme Court of the United States. The parties are in agreement that Petitioner has exhausted her state-court remedies on the issues presented here, that none of the claims are procedurally barred, that the doctrine of non-retroactivity does not apply, and that the petition is timely.

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a habeas petition can only be granted if a state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1-2) (2000).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law; [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that of the Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Express citation or even awareness of the relevant precedent is not required "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court's decision constitutes an "unreasonable application" of clearly established federal law if the state court identified the correct legal rule but unreasonably applied the controlling law to the facts of the case. *Williams*, 529 U.S. at 407. "An unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410. Rather,

"unreasonable" means that a state court's decision lies "well outside the boundaries of

permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

The operative decision under AEDPA is that of the last state court to address any claim

on the merits. *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006). Here, that case is the Illinois

Appellate Court, First District's decision in *People v. Harris*, 398 N.E.2d 1077 (Ill. App. Ct.

2009).

## III. ANALYSIS

## CLAIM 1 - EXCLUSION OF WITNESS TESTIMONY VIOLATED THE SIXTH AMENDMENT RIGHT TO PRESENT WITNESSES

Petitioner's first claim relates to the trial court's refusal to allow Jaquari's brother, Diante

Dancy, to testify for the defense in Petitioner's trial. Characterizing Diante as "the sole

eyewitness to the death of his brother Jaquari," Petitioner asserts that Diante would have testified

to the effect that his brother wrapped the elastic cord around his own neck on the day of his

death. Petitioner argues that the trial court's refusal to allow Diante to testify - and the appellate

court's affirmance on the point - was both an unreasonable determination of fact and an

unreasonable application of the relevant law. Ultimately, Petitioner claims she was deprived of

her sixth amendment right to present witnesses in her own defense. I find that while one aspect

of the appellate court's decision was unreasonable, no petition can issue.

The Illinois Code of Criminal Procedure states in relevant part that:

(a) Every person, irrespective of age, is qualified to be a witness and no person is
disqualified to testify to any matter, except as provided in subsection (b).
(b) A person is disqualified to be a witness if he or she is:
 - (1) Incapable of expressing himself or herself concerning the matter so as to be
understood, either directly or through interpretation by one who can understand
him or her; or
 - (2) Incapable of understanding the duty of a witness to tell the truth.

> (c) A party may move the court prior to a witness' testimony being received in evidence, requesting that the court make a determination if a witness is competent to testify. The hearing shall be conducted outside the presence of the jury and the burden of proof shall be on the moving party.

75 Ill. Comp. Stat. 5/115-14. The decision to exclude Diante's testimony was made in a separate competency hearing. There is no dispute that at the time of the hearing the trial judge improperly placed the burden of proof on the Petitioner to establish Diante's competency, in violation of state rules of criminal procedure. *See* 75 Ill. Comp. Stat. 5/115-14. The trial judge acknowledged the error in a motion for mistrial but allowed that he would not have permitted Diante's testimony under the proper standard. The appellate court credited the trial judge's ruling and found no violation of state criminal procedure rules. The significance of this finding for habeas review is that - as Petitioner points out - the Illinois criminal code satisfies the Constitutional standard. *See Washington v. Texas*, 388 U.S. 14 (1967). Therefore, if the lower court applied the statute correctly, the Constitution has not been offended.

A. Diante's Ability to Understand his Duty to Tell the Truth

The trial judge first found that Diante was incapable of understanding the duty of a witness to tell the truth. In making his determination, the trial judge emphasized that mere recognition of the difference between truth and falsehood was insufficient. Rather, what matters is "understanding the moral duty to come into court, to be placed under oath . . . and to tell the truth." It is here that the trial court's decision became problematic. His next statement was as follows:

> [T]here [*sic*] has been no questions with regard to Diante with regard to his - other than the only questions that were asked, 'What is a lie?' 'You get in trouble.' What is the truth?' 'You get a star, and a star is a good thing.' That gave the Court very little insight into whether or not Diante knows what is the truth and what is a lie or not true. But clearly, there were no questions at all with regard to his understand of an obligation to be truthful.

18

The appellate court affirmed that finding. The problem with both the trial court's determination and the appellate's court affirmance lies in the misallocation of the burden of proof. On the truthfulness inquiry - and that inquiry alone - the tone of the judge's comments indicated clearly that his conclusions were prompted largely by what Petitioner did *not* do in establishing the witness's ability to appreciate the difference between truth and falsehood. That is an approach used when a particular party carries the burden. But, as all parties agree, Petitioner did not bear the burden at the competency, Respondent did.

The appellate court determined that any error was not "outcome determinative" because the trial court judge, when presented with his misapplication of the burden, asserted that he would not have ruled differently if he had used the proper standard initially. *People v. Harris*, 904 N.E.2d 1077, 1092 (Ill. App. Ct. 2009). Only as to the truthfulness factor, I find that the appellate court's decision was not within the realm of the reasonable. The trial court's consideration of this factor clearly turned on what the Petitioner failed to present, rather than what was before him. As stated above, that is only appropriate when a particular party carries the burden on an issue.

No writ can issue on the basis of this unreasonable holding, however, and for two reasons. First, the Illinois witness competency statute is disjunctive. That is, a witness can be disqualified under either the second prong (ability to understand the duty to tell the truth) "or" the first prong (ability to express himself or herself). *See* 75 Ill. Comp. Stat. 5/115-14. As discussed in the following subsection, the trial court's determination on the first prong was sound and the appellate court's determination reasonable. That ground was enough.

19

The second reason is harmless error regarding Diante's potential testimony. As discussed below, the appellate court determined that even if the trial court erred in excluding Diante's testimony, such error was harmless to Petitioner.

B. Diante's Ability to Express Himself

The trial court spent considerably more time discussing the first prong of the incompetency statute, which states that a witness may be disqualified if he or she is "(i)ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him or her."  75 Ill. Comp. Stat. 5/115-14(b)(1).  The trial court's consideration of this issue - unlike its discussion of truthfulness - was not tainted by the application of an incorrect burden of proof.  Here, the court's pronouncements took the tone of positive findings.

The trial court was particularly troubled by Diante's apparent inability "to differentiate between reality and fantasy."  The court pointed out that Diante had said that he spoke to his brother "in heaven," at which time his brother told him his mother killed him.  The court also noted that Diante had said Spiderman was real and that he had seen him in person.

The trial court was also concerned with Diante's "mental capacity at the time of the event to receive accurate impressions, a memory sufficient to retain an independent recollection of the events in question, and . . . [his] capacity to communicate" the events in court.  On this point, the trial judge emphasized that even when Diante did recall certain specific instances, such as playing Spiderman games on the day Jacquari died and observing Jacquari place the elastic from the sheet around his own neck, the events were only recalled in isolation.  That is, Diante was unable to describe the events of the day beyond those two discrete incidents, which themselves

were not placed in a chronological or sequential order. On this point, the appellate court highlighted the following exchange from the hearing:

> Q: Diante, you tolled [*sic*] me you remember playing Spiderman in your bedroom with your brother, is that right?
>
> A: Yes.
>
> Q: Do you remember anything else that happened that day?
>
> A: No.
>
> Q: Nothing at all?
>
> A: No.

The appellate court found that this exchange supported the trial court's summation of Diante's testimony regarding what would be his key testimony, which was as follows: "He's indicated that the only thing that he recalls is playing Spiderman with his brother, the aspect with the cord and the neck, but he remembers nothing else at all from that day." Having already determined that the trial court's then-improper description of the burden of proof was harmless, the appellate court affirmed the trial judge's determination that Diante was incompetent to testify.

C . Harmless Error Regarding Diante's Testimony

In the appellate court, the State also urged a harmless error finding. The appellate court found that even if the trial court erred in disallowing Diante's testimony, the error was harmless beyond a reasonable doubt. *See Harris*, 904 N.E.2d at 1095. When such a determination is made and challenged on *habeas* review, it is to be reviewed under the reasonableness standard. *Johnson v. Acevedo*, 572 F.3d 398, 404 (7th Cir. 2009). If reasonable, then the federal challenge on that point "is over and no collateral relief issues." *See id.*

21

The appellate court's determination was reasonable. The court determined that the prosecution's evidence, which they characterized as "a detailed and corroborated videotaped confession," was "overwhelming."

Petitioner contends that the precise benefit of Diante's testimony would have been to cast her confession in a different and more suspicious light. The court analyzed that very argument, however, when it considered what impact Diante's testimony would have had on the state's case. The court allowed that "at best, the defense might have placed before the jury Diante's observation of Jaquari wrapping an elastic band around his neck" on the day Jaquari died. The court noted, however, that other witnesses who did testify described Jaquari's having done this before. Further, the court noted that the People would have been able to secure Diante's admission that he was asleep when Jaquari's death actually occurred.[2] This admission was consistent with Sta-Von's testimony that Diante was asleep when he came into the boys' room to find Jaquari dead, the court said. While not explicitly stated, an implication of the court's analysis is that Diante's testimony may have actually hurt Petitioner's case in that it was consistent with other aspects of the People's case. Further, had Petitioner billed Diante as an "eyewitness" to Jaquari's death (as they have done in the *habeas* briefings here) - only to have the State secure the admission that Diante was asleep when the incident actually occurred - this could have not only been unhelpful but actually harmful.

My views of the correctness of the appellate court's analysis (both its expressions and its implications) are of course irrelevant. *See id.* at 406. What matters is whether it was reasonable

---

[2]Petitioner contends this aspect of the appellate court's ruling was unsupported by the record. However, based on the following exchange that took place in Diante's competency hearing, the factual determination is sound: "Q: Okay. Do you remember when you were talking to Ms. Wilson that you told her when your brother got hurt that you were asleep? A: Yes."

for the court to determine that any error in disallowing Diante's testimony was harmless beyond a reasonable doubt.  I find that the court's considered opinion on the issue was reasonable.

## CLAIM 2 - DUE PROCESS VIOLATION FOR FAILURE TO PROVE AN ELEMENT OF THE CRIME

Petitioner next argues that her conviction is invalid because the state did not prove - and could not have proven - an element of the crime of first degree murder.  This claim is cognizable on *habeas* review as an application of *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).[3]  *Jackson* requires that the prosecution put forward enough evidence of each element of the offense that a rational fact finder could find the Petitioner guilty beyond a reasonable doubt.  *See id; see also Curtis v. Montgomery*, 552 F.3d 578, 581 (7th Cir. 2009).

The element at issue is one prong of the *corpus delecti* in a murder case.  *Corpus delecti* means that a crime occurred, and in a homicide there are two sub-elements: proof of the fact of death and proof that a criminal agency produced that death.  *See People v. Ehlert*, 811 N.E.2d 620, 625-26 (Ill. 2004).  Nobody disputes the tragic death of Jaquari Dancy. Petitioner disputes that there is sufficient proof that she was the agent of that death.

Petitioner's argument invokes some subtleties of substantive criminal law and of evidentiary rules.  She argues that her confession stands as the only proof that a crime (as opposed to a tragic accident) occurred.  She then highlights the rule that "in establishing the *corpus delecti*, there must be some evidence, apart from the confession, demonstrating that a crime occurred."  *People v. Willingham*, 432 N.E.2d 861, 864 (Ill. 1982).  Petitioner acknowledges Denton's opinion but insists that his opinion was merely "derivative" of that

---

[3]The appellate court did not cite *Jackson* in addressing this point.  Rather, it proceeded under a "sufficiency of the evidence" header.  No matter, as the parties agree that the claim is reviewable and express citation is not required.  *See Early*, 537 U.S. at 8 (2002).

confession and thus ultimately not independent corroboration. Legally speaking, this would mean that *no evidence* supported criminal agency in the *corpus delecti* because an uncorroborated confession, without more, is no evidence. *See generally id.* If true, this would obviously result in a *Jackson* violation.

Petitioner's argument, however, does not fully reflect what the appellate court determined to have occurred here. As described above, Denton's autopsy took place the very day after Jaqauri's death. In conducting the autopsy, Denton had accepted at face value Petitioner's initial story that Jaquari had fallen from the upper bunk and was ensnared by the fitted sheet:

> My opinion at the time was that this was a tragic accident, that this was a boy who was in his upper bunk bed who had become entangled with an elastic bed fitted sheet and had fallen to the ground from his upper bunk and that this was just a tragic accident that occurred and it was a hanging.

According to the appellate court, detectives brought Petitioner's confession to Denton several days later, along with "detective reports and scene photographs of the room and the bunk bed." Among the photographs was one showing blood on the lower bunk. Additionally, Denton was told about the witnesses' descriptions of Petitioner hitting Jaquari with a belt earlier in the day. It was this fuller context - the confession *and* the supporting documents and evidence - that prompted Denton's change in opinion. The appellate court was satisfied with this corroborative evidence (including crediting Denton's opinion testimony), and I find their satisfaction to be reasonable.

A final note in addressing Petitioner's challenge. The way *corpus delecti* works when a confession is in play is that, once "some evidence" corroborates the confession of the crime, the confession itself becomes part of the evidentiary basis for overcoming reasonable doubt on the element. *Willingham*, 432 N.E.2d at 865. Once the confession attaches, there can be no doubt

that the evidence mounted as to *corpus delicti* was sufficient. The appellate court's determination to that effect was reasonable.

## CLAIM 3 - DENIAL OF PETITIONER'S MOTION TO SUPPRESS VIOLATED THE FIFTH AMENDMENT

Petitioner's third claim is that the trial court's denial of her motion to suppress her videotaped confession violated the Fifth Amendment. Petitioner's basis for this claim is that the detectives' questioning of her was an unconstitutional "question first, warn later" interrogation. *See Missouri v. Seibert*, 542 U.S. 600, 613-14 (2004).

The Illinois appellate court's primary basis for rejecting this claim was that Harris was not "in custody" during the first and second rounds of questioning, which questioning preceded her first confession. *Harris*, 904 N.E.2d at 1089 ("[W]e are unable to conclude that Petitioner was in custody for *Miranda* purposes prior to her arrest. Because Petitioner's custodial interrogation did not begin until *Miranda* warnings were given, a *Seibert* violation could not have occurred.")[4]

Petitioner challenges this determination on several grounds. First, Petitioner asserts that an unconstitutional "question first, warn later" interrogation occurred regardless of whether she was in custody for the pre-warning questioning and her first confession. Unfortunately for Petitioner, the Seventh Circuit has interpreted *Seibert* to the contrary. In *United States v. Thompson*, the court affirmed denial of a motion to suppress, the basis for which was that FBI

---

[4]Petitioner refers to this holding as "[t]he majority's alternate basis for affirming the denial of [her] motion to suppress," but that was clearly not the majority's approach. The majority conducted its custody analysis first and, after determining that Petitioner was not in custody, made its determination that "[b]ecause Defendant's custodial interrogation did not begin until *Miranda* warnings were given, a *Seibert* violation could not have occurred." *Harris*, 904 N.E.2d at 1089. This was, therefore, the court's primary holding.

agents had employed "question first, warn later" tactics. 496 F.3d 807, 811 (7th Cir. 2007). The

Seventh Circuit characterized *Seibert* 's holding as declaring unconstitutional "the 'question-first'

police protocol for *custodial interrogation*." *Id.* (citing *Seibert* , 542 U.S. at 604-605 ("This case

tests a police protocol for *custodial* interrogation that calls for giving no warnings of the rights to

silence and counsel until interrogation has produced a confession.")) (emphasis added). The court

determined the initial questioning by the agents in the case to be non-custodial and for that

express reason "*Seibert* therefore does not apply." *Id.* Petitioner's first challenge to the Illinois

appellate court fails.

Petitioner next argues that even if an in-custody determination is necessary in order for

*Seibert* to apply, the appellate court's ruling on the custody issue was so badly flawed as to

warrant automatic granting of the writ. The court applied the correct standard.[5] Therefore, I

consider whether the court's determination was or was not "an unreasonable application" of that

standard. *See Yarborough v. Alvarado* , 541 U.S. 652 (2004) (applying 28 U.S.C. Sec.

2254(d)(1) standard to custody determination).

The court started by considering the location, length, mode and mood of the questioning.

*People v. Harris*, 904 N.E.2d at 1088. The court determined that the mood of the initial

---

[5] "What were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have believed he or she was not at liberty to terminate the interrogation and leave." *See Harris*, 904 N.E.2d at 1087 (quoting *People v. Braggs*, 810 N.E.2d 472, 481 (Ill. 2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995))). The court outlined such factors as "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Id.* at 1087-88. Finally, the court emphasized that the analysis is an objective one, concerning "a reasonable person, innocent of any crime." *Id.*

questioning was that of a death investigation, not a homicide.  There was no show of force nor were there other indicia of formal arrest.  The officers invited Petitioner to take her own car to the Area 5 police station; Petitioner declined, stating that she was too emotional.  The officers therefore offered Petitioner a ride to the station, along with Diante.

Once at the station, Petitioner was taken to an interview room.  The appellate court acknowledged that any police interview room carries some air of coercion.  *Id.*  Nevertheless, the court noted that the room was not an interrogation room, but a room adorned with butterflies and ladybugs, generally reserved for victims of sexual assault.

As for the age, intelligence, and mental makeup of the accused, the appellate court noted that she was twenty-three years old and a college graduate.  Her degree was in psychology, and she had been putting the degree to use as a "Psychiatric Rehabilitation Service Coordinator" in a nursing facility.  The trial court acknowledged that Petitioner was "upset," but asserted that there was no other evidence of mental or intellectual deficiency.

Finally, the appellate court discussed the timing of the questioning.  In the first round of questioning, the detectives questioned Petitioner for approximately thirty minutes, at which time Petitioner was left in the room with only her son Diante and with the door left open.  Petitioner was then left alone for roughly three hours, at which point two different detectives arrived to confront Petitioner with inconsistencies they had discovered between her previous statements and the comments of witnesses from near the scene.  After fifteen minutes of questioning in this vein, Petitioner spontaneously confessed, at which point the officers immediately issued *Miranda* warnings.

In sum, the appellate court laid out the proper standard and conducted a thorough analysis of the facts in light of that standard.  The court's decision was well within the bounds of reason.

27

The Illinois appellate court went on to state that "even were we to assume that [Petitioner] was subjected to custodial interrogation at the inception of the second interview, we are not persuaded that a different result would obtain under *Seibert* or its progeny." *Harris*, 904 N.E.2d at 1089. The court then went on to apply an intent-centered test from *Seibert* that was the preference of Justice Kennedy, who concurred with a plurality. *See Missouri v. Seibert*, 542 U.S. 600, 622 (2004) ("I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning."). Applying that test, the appellate court found that the interrogation - even if custodial - did not run afoul of *Seibert*.

Petitioner's first challenge to this alternative holding comes under 28 U.S.C. § 2254(d)(1). That is, Petitioner argues that the intent-based test was not the rule that came out of *Seibert*, and that therefore the appellate court's decision applying that test was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* Petitioner cites dicta from *United States v. Heron*, 564 F.3d 879, 885 (7th Cir. 2009), which suggests that the plurality's objective test regarding the effectiveness of midstream warnings is the clearly established law issued in *Seibert*. But the Seventh Circuit, citing *Heron* itself, has expressly declared that it "has yet to choose which test should govern." *United States v. Lee*, 618 F.3d 667, 678 (7th Cir. 2010). By contrast, seven circuit courts have expressly chosen the intent-based test. *See, e.g. United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007); *United States v. Kiam*, 432 F.3d 524, 532 (3d Cir. 2006); *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006); *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006); *United States v. Courtney*, 463 F.3d at 338 (5th Cir. 2006); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005); *United States v. Briones*, 390 F.3d 610, 613-14 (8th Cir. 2004). Other circuits have

noted the difficulties in determining the proper test arising from *Seibert*. *See United States v. Jackson*, 608 F.3d 100, 103-04 (1st Cir. 2010) (applying both approaches to deny relief); *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008) (recognizing "confusion" about *Siebert*'s holding but deciding on the facts of the case that the dispute need not be settled); *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (same).

Petitioner's additional challenge here assumes, without conceding, that the intent-based test controls. Petitioner argues that even if that test is viable, the appellate court applied it unreasonably because it only considered the officers' subjective intent, and not other objective evidence that might support an inference of deliberate withholding of the *Miranda* warning. This is simply not true, as the appellate court's discussion speaks exactly the language of inference which Petitioner claims is lacking. *See Harris*, 904 N.E.2d at 1090 ("[W]e cannot infer that the detectives deliberately employed a two-step strategy to undermine *Miranda* or to evade its requirements. There is simply no evidence that the questioning was systematic, exhaustive and managed with psychological skill." (quotation omitted)). This statement came on the heels of the court's consideration of all the facts surrounding Petitioner's questioning which was not limited to the subjective intent of the officers.

CLAIM 4 - INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner's final claim is that her trial counsel was ineffective at numerous points in pre-trial and trial proceedings. To evaluate this claim, I must look to the substantive standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) through the lens supplied by AEDPA. To prevail on an ineffective assistance claim, *Strickland* requires that a Defendant demonstrate that (1) counsel's performance fell "outside the wide range of professionally competent assistance and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result

29

of the proceeding would have been different." *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir.

2011) (quoting *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009) (quoting *Strickland*, 466

U.S. at 690, 694)). The standard for judging this rule alone is "a most deferential one" and

therefore [s]urmounting *Strickland*'s high bar is never an easy task." *Harrington v. Richter*, 131

S.Ct. 770, 788 (2011). Prevailing on a habeas claim for ineffective assistance in the present

circumstance is "all the more difficult" because I must apply AEDPA's "highly deferential"

standard to the *Strickland* standard which is, itself, highly deferential. *See id.*

Petitioner's claim is limited to an assertion that the state court's ruling was an

unreasonable application of clearly established Federal law. *See* 28 U.S.C. §2254(d)(1).

A. Ineffective Assistance at Diante Dancy's Competency Hearing

Petitioner's first ineffective assistance argument is that her counsel was ineffective during

the competency hearing regarding Diante Dancy. Though the appellate court did not say so, it

had essentially ruled on this subset of the ineffective assistance of counsel claim when it ruled,

under Claim I, that the trial court's refusal to allow Diante to testify was harmless beyond a

reasonable doubt. That holding ruled out any notion that there is "a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different,"

the second required element of *Strickland's* high standard. *See Harrington*, 131 S.Ct. at 787

(2011) (quoting *Strickland*, 466 U.S. at 694). Put another way, the appellate court's reasonable

determination that it was harmless beyond a reasonable doubt for Diante not to testify foreclosed

any argument that ineffective assistance in the competency hearing resulted in *Strickland*

prejudice. Under *Strickland*, "[i]f it is easier to dispose of an ineffectiveness claim on the ground

of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

466 U.S. at 697. That course must be followed on Petitioner's first ineffective assistance argument.

B. Ineffective Assistance For Withdrawing a Motion to Quash Arrest

Petitioner's next ineffective assistance argument is that her counsel was ineffective by withdrawing a motion to quash her arrest for a lack of probable cause. Petitioner is not arguing that her formal arrest - the one that occurred after her spontaneous confession - was unsupported by probable cause. Rather, she argues that she was under informal arrest for Fourth Amendment purposes much earlier in her interrogation and at that point there was no probable cause to arrest her. *See Sornberger v. City of Knoxville, IL*, 434 F.3d 1006, 1017 (7th Cir. 2006) (recognizing possibility that "arrest" may occur prior to formal arrest).[6]

To obtain an appellate victory on this basis, the criminal Defendant had to prove the usual *Strickland* requirements and that her Fourth Amendment claim is meritorious. *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010). On direct *Strickland* review in the appellate court, these already "difficult showings" are made even more difficult under AEDPA, which adds "an extra layer of deference" to my review. *Id.* at 412.

The Illinois Appellate Court proceeded directly to the merits of the motion to quash arrest and determined that it did not have "any semblance of success." *Harris*, 904 N.E.2d at 1099. I therefore evaluate that holding for its reasonableness under AEDPA. The appellate court considered the issue in the following manner:

---

[6]The distinction between formal "arrest" and "custody" was recognized within a year of *Miranda*. *See People v. Rodney*, 233 N.E.2d 255, 256 (N.Y. 1967); *see also United States v. Davis*, 259 F. Supp. 496, 498 (D. Mass. 1966) (no custody where Defendant was unaware investigator had an arrest warrant in his pocket).

31

> First, the evidence clearly established a voluntary accompaniment to Area 5.
> *People v. Eddmonds*, 101 Ill. 2d 44, 61, 461 N.E.2d 347, 355, 77 Ill. Dec. 724
> (1984) (a person is not under arrest where he volunteered to meet with the police
> and was prepared to accompany them to the station). Second, upon arrival at the
> station Defendant was not placed in an interrogation room, but rather in the "quiet
> room," a setting used for victims of sexual assault. Third, although Defendant was
> questioned by the detectives, she was not a suspect or target; her status as a
> cooperating parent did not change until her spontaneous admission of guilt.
> Fourth, there was no custodial interrogation before Defendant's lawful arrest.
> Given the state of the record, we fail to discern how Defendant's motion to quash
> arrest had any semblance of success.

*Id.* The fourth consideration effectively incorporated by reference the appellate court's prior

determination that Petitioner was not "in custody" for *Miranda* purposes, a determination I have

already found to be reasonable. The critical issue becomes, as the parties have recognized,

whether the *Miranda* determination foreclosed a determination of arrest under the Fourth

Amendment.

Petitioner argues that the test defining *Miranda* custody is "similar" but "not the same" as

the test defining arrest for Fourth Amendment purposes. In stressing this point, Petitioner cites

to *United States v. Smith,* 3 F.3d 1088, 1096-97 (7th Cir. 1993). In that case, the Seventh Circuit

stated that "a completely different analysis of the circumstances is required" when a court is

considering the reasonableness of a Fourth Amendment *Terry* stop as opposed to a custody

determination for *Miranda* purposes. *Id*. at 1097. But that is not the relevant comparison for our

case. *Terry* stops do not require probable cause, and thus the absence of probable cause in a

*Terry* situation is not a valid complaint. At issue here is the relationship of "arrest" under the

Fourth Amendment and "custody" under *Miranda* and the Fifth Amendment. On that point,

courts have said that cases interpreting the latter standard are relevant to claims involving the

former standard because "the standards . . . are similar, if not identical." *United States v. Bravo*,

295 F.3d 1002, 1009 n. 5 (9th Cir. 2002). This makes sense, because *Miranda* custody is itself

defined by reference to arrest. *See Smith*, 3 F.3d at 1097 ("It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest." (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983))).[7]

The appellate court's reasonable determination that Petitioner was not "in custody" effectively foreclosed her ineffective assistance counsel argument based on counsel's withdrawal of a motion to quash arrest. The custody determination automatically signified that the motion could not have been meritorious in the court's reasonable opinion.

C.  Ineffective Assistance for Failure to Present Expert Testimony

Petitioner's third major ground for arguing ineffective assistance of counsel is the failure of counsel to call expert witnesses on two issues central to her case: first, the relative rates of accidental strangulations to intentional ones in circumstances similar to Jacquari's death, and second, false confessions.

The appellate court's decision here came under *Strickland's* first prong, deficient performance. To demonstrate deficient performance, Petitioner must show that her counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The question is whether an attorney's representation must amount to incompetence under prevailing professional norms, not whether it deviated from the best or even most common practices. *Sussman*, 636 F.3d at 349. Direct *Strickland* review of the attorney's performance is

---

[7]While indicia of arrest (judged purely by the actions of the arresting officers) are commonly considered when deciding the existence of custody, they are considered only insofar as the person questioned reasonably perceived them. Custody must be determined based on "how a reasonable person in the suspect's position would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, (2004).

"highly deferential" and reflects "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689); *see also Harrington,* 131 S.Ct. at 787 (2011) ("A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance."). AEDPA adds yet another layer of deference to this already deferential review posture. *Id.* at 788.

Taking the strangulation issue first, Petitioner argues that an expert could have provided important context on the subject of accidental child strangulations. Post-trial, on appeal, and in her petition she provides the example of Dr. Ryan Stevens, a head and neck specialist who has studied the mechanisms and circumstances of accidental asphyxiation in children. Among other things, Dr. Stevens could have pointed to the fact that in one study, only seventeen of 176 child asphyxia deaths proved to be intentional rather than accidental. Additionally, Dr. Stevens could offered expert testimony regarding how accidental strangulations have occurred, including situations involving supine - as opposed to suspended - children.

The appellate court began its consideration of this issue by citing to state law for the proposition that "decisions concerning which evidence to present and which witnesses to call generally fall within the rubric of trial strategy." *Harris*, 904 N.E.2d at 1098 (citing *People v. Negron*, 697 N.E.2d 329, 342 (Ill. App. Ct. 1998). The appellate court went to properly identify that it was the Petitioner's burden to overcome the strategy presumption. The court concluded that "[a]lthough we are mindful that the subject of accidental strangulation is well within the expertise of forensic pathologists, defense counsel could well discern that given the changing

opinions of Dr. Denton, the subject was adequately presented before the jury." *Harris*, 904 N.E.2d at 1099.

Though the analysis was brief, the court's conclusion was reasonable. The court began by apparently acknowledging, in the first clause of the quotation above, that an expert witness could have been called. The second clause proceeds from the presumption that it was a deliberate tactical decision not to call an expert because, on both direct and cross-examination, Dr. Denton (a prosecution witness), was forced to explain that his own opinion in this very case was originally that Jacquari had died from an accidental strangulation. The appellate court decided that Petitioner had not overcome the presumption, as was her burden. I find that conclusion reasonable, particularly under the circumstances of this case. The defense could well have surmised that an expert would not have been helpful given that the state's own witness was forced to admit that his initial determination was that Jacquari's death was an accident.

Petitioner cites *Ellison v. Acevedo* for the proposition that, in Petitioner's words "when there is no excuse for not calling an expert witness, the failure to call such a witness may constitute ineffective assistance." But what the court actually said (which Petitioner acknowledges) was that "[i]f the need for an expert was clear and one was reasonably available, counsel should at least consult with one." *Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010). Though the appellate court did not consider *Ellison* directly (likely because it had not yet been decided), the court's determination was essentially that the need for an expert was not necessarily clear because the prosecution's own witness admitted the possibility of an accidental strangulation.

Petitioner next argues that her trial counsel was ineffective for failing to call an expert on false confessions. Petitioner believes that her trial counsel should have called an expert such as

Dr. Richard Ofshe, a purported expert in the phenomenon of false confessions and the conditions under which they are likely to occur. An additional expert Petitioner claims her counsel should have called is Dr. I. Bruce Frumkin, a clinical psychiatrist who produced a profile of Petitioner.

The appellate court disposed of this claim by stating that it found no basis for the admissibility of such evidence in Illinois law. *Harris*, 904 N.E.2d at 1099. I interpret this as disposing the claim on the first *Strickland* prong, because if the evidence is of questionable admissibility, counsel could hardly be called ineffective for failing to pursue it. Petitioner has acknowledged that no Illinois state court has admitted expert testimony on false confessions, but highlights caselaw from federal courts in Illinois admitting not only this type of evidence, but in fact the testimony of the very expert that Petitioner relied upon in her post-trial motions, Dr. Ofshe. *See, e.g., United States v. Hall*, 974 F. Supp. 1198, 1205-06 (C.D. Ill. 1997). The appellate court ultimately concluded that it had no need to delve further into the issue because it saw no showing to support Illinois' threshold "general acceptance" standard. *Harris*, 904 N.E.2d at 1099. (citing *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)[8]).

Given the state of the law in Illinois, counsel cannot be said to have been ineffective for failing to pursue an expert in this area.

D. Cumulative Ineffective Assistance of Counsel

Petitioner's final argument is that even if none of counsel's individual errors constituted ineffective assistance, the accumulation of all of counsel's errors rendered the assistance constitutionally ineffective. The Seventh Circuit has said that "[a]lthough a specific error,

---

[8] The Supreme Court of the United States declared *Frye's* test superceded by the enactment of the Federal Rules of Evidence concerning experts. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Illinois courts have retained *Frye's* standard. *In re Simons*, 821 N.E.2d 1184, 1188-1189 (Ill. 2004).

standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." *Malone v. Walls*, 538 F.3d 744, 762 (7th Cir. 2008); *see also Washington v. Smith*, 219 F.3d 620, 634-35 (7th Cir. 2000).

Petitioner argues that, in addition to each of the previously considered errors, counsel projected a general aura of incompetence which angered the judge and likely turned off the jury. Important examples include failing to properly utilize leading questions in appropriate examinations, a lack of understanding as to how to properly lay foundation for exhibits, and going over the time limit in closing argument, prompting sustained objections and admonishments from the judge during the important final minutes of the statement.

The appellate court was unpersuaded by this argument, saying first that Petitioner had failed "to alert [the appellate] court to the specifics of counsel's lack of understanding and how it impacted the results of the trial," thereby offering "little insight into the merits" of Petitioner's claim. *Harris*, 904 N.E.2d at 1100.  The court then surveyed briefly what counsel had done in the case, and was satisfied that counsel had been reasonably competent. The court noted that in advance of trial counsel pursued a motion to suppress and invoked Petitioner's speedy trial rights.  The court added that counsel presented a clear theory in both its opening statement and closing argument, theory that was further demonstrated through counsel's examination of State and defense witnesses.

What the appellate court did not do was cite to the proper legal standard for considering this type of claim.  The appellate court should have recognized that "the pattern of counsel's deficiencies must be considered in their totality," *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) and that these deficiencies must rise to a level such that they "undermine the court's confidence in the outcome." *Malone v. Walls*, 538 F.3d 1022, 1030 (7th Cir. 2008).

Nevertheless, citation to the relevant precedent is not required "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Here, at a minimum, the result does not contradict the proper precedent. Even taken together, counsel's itemized errors were not so overwhelming to undermine confidence in the outcome. And Petitioner's claim that her counsel resulted in "losing the confidence of...the jury" is purely speculative. The cumulative ineffectiveness claim must fail.

## IV.  CERTIFICATE OF APPEALABILITY

Under the 2009 amendments to the Rules governing § 2254 proceedings "the district court must issue or deny a certificate of appealability ("COA") when it enters a final judgment adverse to the applicant" for a writ of habeas corpus.

Section 2253(c) permits issuance of a COA only where petitioner has made a "substantial showing of the denial of a constitutional right." *See id.*; *see also Miller-El v. Cockrell*, 537 U.S. 322 at 336 (2003). Petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.*

I find that Petitioner's claims 1 and 2 do not meet this standard, but that claims 3 and 4 do. Therefore, a COA is granted as to those latter claims.

## V. CONCLUSION

For the reasons above, Petitioner's request for a writ of habeas corpus must be denied, but she has earned a certificate of appealability as to two of her claims.

ENTER: James B. Zagel

38

James B. Zagel
United States District Judge

DATE:  December 14, 2011